FILED

2007 Aug-20  PM 02:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MYRA MARIE BROWN** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **vs.** | } | **CASE NO.: 2:06-CV-1195-RDP** |
| | } | |
| | } | |
| **WAL-MART STORES EAST, L.P.,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

### I.      INTRODUCTION

The court has before it Defendant's Motion for Summary Judgment filed on April 23, 2007. (Doc. #13).  On May 16, 2007, Plaintiff filed her opposition.  (Doc. #17).  Defendant filed its reply on May 25, 2007.  (Doc. #18).  The motion was deemed under submission, without oral argument as of May 25, 2007 (Docs. #7, 10).  After reviewing the parties' filings, the court concludes that there are no disputed issues of material fact, and Defendant's Motion for Summary Judgment is due to be granted.

### II.      SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation and citation omitted).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or

filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial, but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115–16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## III.    RELEVANT UNDISPUTED FACTS

Wal-Mart hired Plaintiff, who is African-American, on February 11, 2000, as a Sales Associate at Store No. 423 located in Alabaster, Alabama. (Doc. #16 Ex. 1 at 72–73, 84). At the time she was hired, Plaintiff went through an orientation process, which included training on Wal-

Mart's policies and procedures.  (*Id.* at 81–86).  Wal-Mart has an Associate Purchases Policy (the "Policy"),[1] which states that "merchandise must have been marked down and offered to the public at the lower price for at least twenty-four hours before any Associate, or any salaried member of Management, including the Facility Manager, can purchase it."  (Doc. #14 Ex. 6).  The Policy goes further to note that "[v]iolation of any section of this [P]olicy may result in disciplinary action up to and including termination."  (*Id.*).  The Policy is located on Wal-Mart's pipeline/intranet, which is a web-based tool.  (Doc. #16 Ex. 6 at 21).  All Associates have open access to this Policy at any time.  (*Id.*)  Plaintiff was aware that this computer-based informational tool existed.  (Doc. #16 Ex. 1 at 92–93).  All new Wal-Mart Associates receive Computer Based Learning training upon initial hire and throughout their employment.  (Doc. #14 Ex. 6; Doc. #16 Ex. 1 at 81–83).

Wal-Mart also has a Discrimination and Harassment Prevention Policy about which Plaintiff received training every two or three months.  (Doc. #14 Ex. 1 at 103).  Dan Fagan, an African-American District Manager, conducted some of this training.  (*Id.*).

In 2001, Plaintiff was promoted to the position of Department Manager of Health and Beauty Aids.  (Doc. #14 Ex. 1 at 73–74).  Although the title of this position is "Department Manger," Plaintiff admits it was an hourly (rather than a salaried) position.  (*Id.* at 74).

During Plaintiff's employment with Wal-Mart, she had six performance evaluations.  (Doc. #14 Ex. 8).  On each of these evaluations, she received a "meets or exceeds expectations" score, and some of those scores were earned in the area of following proper procedure for markups/markdowns, price changes, and clearance merchandise.  (*Id.*).

---

[1]The Policy applies to all Wal-Mart Associates, regular, temporary, full time, peak time, hourly and salaried.  (Doc. #14 Ex. 6).

In May 2002, Keith Becton, who is Caucasian, became the Store Manager of Store No. 423. (Doc. #16 Ex. 6 at 8).  Shortly thereafter, Plaintiff came to believe Mr. Becton was prejudiced against African-Americans.  (Doc. #16 Ex. 1 at 47).  There was not a particular incident which fueled Plaintiff's belief; however, she claims there were "little incidents" which led her to believe that Mr. Becton was biased.  (*Id*. at 37–40, 47–48).  As one example, Plaintiff asserts that in May or June 2005, Mr. Becton and some other Associates were in the breakroom.  (*Id*. at 37–39)*.*  Mr. Becton spoke over the walkie-talkie with Plaintiff's supervisor and said, "I have [Plaintiff] with me, and when I'm finished with her, I'll let you know, but for the time being, I have her–I have her."  (*Id*. at 38).  Plaintiff believed Mr. Becton's actions to be racial because he "was always that way with [her] and . . . with several blacks."  (*Id*. at 39–40).  Another practice that led Plaintiff to believe Mr. Becton was prejudiced is that he recruited Department Managers from other stores to work at Store No. 423, while Plaintiff felt people within the store could do the job.  (*Id*. at 58–60).

Plaintiff made a complaint to Mr. Fagan concerning Mr. Becton's prejudicial treatment in June or July 2005, about three to four months before she was terminated in October 2005.  (*Id*. at 32–33).  While in Mr. Fagan's office, Plaintiff stated that Mr. Becton was prejudiced and abused his authority.  (*Id.* at 37).  During this meeting, the only "incident" that was discussed was the incident when Mr. Becton spoke over the walkie-talkie with Plaintiff's supervisor while in the breakroom.  (*Id.* at 43–44).  Plaintiff  did not go into any additional detail or give Mr. Fagan any specific examples of how Mr. Becton was "prejudiced" and/or "abused his authority."  (*Id*. at 42–44).

Plaintiff stated that after she complained of discrimination, she felt her employment would be terminated if she failed to comply with any of Mr. Becton's requests.  (*Id*. at 48).  One such incident occurred when she ordered Wal-Mart shirts.  (*Id.* at 49–53).  Mr. Becton later found out

about the shirt order and explained to Plaintiff that particular people within Wal-Mart are appointed to order shirts and she did not have the authority to do so.  (*Id*. at 50–51).  On a different occasion, Plaintiff felt threatened when Mr. Becton asked her to lead the "Wal-Mart Cheer" during one of Wal-Mart's morning meetings.  (*Id.* at 54).  However, it is common for Mr. Becton to ask different Associates to lead the Cheer during morning meetings.  (*Id*. at 57).

Plaintiff acknowledges that she knew about Wal-Mart's dishonesty policy contained in the Associate Handbook, and that policy describes "dishonesty" to include misappropriation of goods or money, misuse of the Associate discount privilege, or other improper transactions.  (*Id*. at 95–96). She also believes that an Associate should always conduct him/herself in a manner that will leave no doubt as to honesty, and that if an Associate has any doubts regarding what action should be taken, the Associate should address the situation with a manager. (*Id.* at 95). Plaintiff also concedes that in a retail environment, taking anything, whether large or small, is dishonest.  (*Id.* at 94).

It was Plaintiff's understanding that anyone in charge of a department could mark items down.  (*Id*. at 111).  However, Defendant contends that while Plaintiff is correct that a Department Manager who is an hourly employee could perform the actual markdown, only a salaried member of management may authorize the *initiation* of a markdown.  (Doc. #16 Ex 6 at 16–17).  Department Managers do not have the discretion to authorize or initiate a markdown.  (*Id*.)[2]

On October 14, 2005, Plaintiff marked down a $53.00 MP3 Player to $10.00 specifically so she could purchase the item.  (Doc. #16 Ex. 1 at 121–26).  Plaintiff purchased the MP3 Player the same day she took the mark down, and Wal-Mart determined that this constituted a violation of

---

[2]Although Plaintiff disputes this assertion, the outcome of Defendant's motion does not turn on the resolution of that dispute, and the court views the evidence in the light most favorable to Plaintiff for purposes of addressing the motion.

Wal-Mart's Associate Purchases Policy. (*Id.* at 121–26).  On that day during her break, Plaintiff had visited the Electronics Department.  The hourly Department Manager of Electronics, Dana Naish, who is Caucasian, was marking down items in her department.  (*Id.* at 116–18, 144).  Plaintiff asked Ms. Naish if she had "any good items" for markdown. (*Id.* at 119–20).   Ms. Naish responded that she had some MP3 Players she needed to get out of the Store.  (*Id.* at 116–17).  The MP3 Players were located in a locked case and Ms. Naish had not yet marked down the items. (*Id.* at 119).  Plaintiff told Ms. Naish when she did mark the MP3 Players down, she wanted one.  (*Id.*).

Later that same afternoon, Ms. Naish went to Plaintiff's department.  (*Id.* at 119–20).  Plaintiff inquired whether Ms. Naish had taken the markdown on the MP3 Players.  (*Id.*).  Ms. Naish responded that she had not, and that she was already clocked out.  Ms. Naish then told Plaintiff to take the markdown.  (*Id.*).

Plaintiff cannot remember the amount of the markdown, but Ms. Naish had told her to take one-half off whatever the item scanned.  (*Id.* at 119–20).  Plaintiff testified that she thinks Ms. Naish said the MP3 Players were about $25.00.  (*Id.*).   When Plaintiff initially scanned the item, she realized it was not on file.  (*Id.* at 116).  Therefore, in order to accomplish the markdown, Plaintiff took her hand-held computer (containing her initials), to another Associate, Juliette Montgomery.  (*Id.* at 114–16).  Because Plaintiff did not understand how to place items back on file, she asked Ms. Montgomery to do that for her.

When Plaintiff re-scanned the item, she thinks the item scanned for $89 or $90.  (*Id.* at 121).  Defendant's computer printouts reflect that when the MP3 Player was put back on file under Plaintiff's initials, it scanned at $53.00.  (Doc. #14 Ex. 9).   A second printout reflects Plaintiff marked the item down from $53.00 to $10.00.  (*Id.*).

Wal-Mart's Loss Prevention Department conducted an investigation into the markdown and subsequent purchase of the MP3 Player by Plaintiff. (Doc. #16 Ex. 6 at 19–20). Plaintiff submitted a statement to Loss Prevention indicating that she had been told that the MP3 Player had been marked down to $27.00 and that she could take one-half off that price. (Doc. #14 Ex. 10). In her deposition testimony, however, Plaintiff testified that it would not have been one-half of $53.00, but would have been "like half of the $25." (Doc. #16 Ex. 1 at 123). Although one-half of $25.00 would be $12.50, Plaintiff said Mr. Becton and Mr. Stoessel had always told Associates to round off the clearance prices. (*Id.* at 123–24).

Wal-Mart's clearance guidelines give salaried members of management discretion to determine the appropriate price to sell. (Doc. #16 Ex. 6 at 45–46). Plaintiff admitted that instead of rounding the price to $12.00, she "just did $10 because that's the way – that's the reason [she] always marked [hers] down in [her] department." (Doc. #16 Ex. 1 at 124). Ms. Naish did not tell Plaintiff to mark the MP3 Player down to $10.00. (*Id.* at 125).

As part of its investigation, Wal-Mart's Loss Prevention Department had two meetings with Plaintiff, wherein she was given an opportunity to explain what happened. (*Id.* at 129–33). During both of her meetings with Loss Prevention, Plaintiff said, "if they are going to fire me, go ahead and fire me; or if they wanted me to go home, to just let me do that because I was really nervous and upset." (*Id.* at 133). Mr. Becton told Plaintiff that she needed to go home for a few days without pay while they investigated the matter and made a determination as to whether and how she should be disciplined. (*Id.*).

After reviewing the video and documents provided by Loss Prevention, Mr. Becton informed Mr. Fagan, about the investigation and recommended termination of Plaintiff's employment. (Doc.

#16 Ex. 6 at 19, 29, 31, 33, 37).  Mr. Fagan then indicated to Mr. Becton that he would send the

information to Regional Personnel Manager, Beatrice Floyd, and discuss it with her.  (*Id*. at 37).  Mr.

Fagan reviewed the investigation file and contacted Ms. Floyd, who is African-American, to discuss

the appropriate actions to take with respect to Plaintiff's violation of Wal-Mart's Associate

Purchases Policy.  (Doc. #16 Ex. 5 at 33–34, 41–42; Doc. #13 Ex. 1 at ¶ 16).[3]  When dealing with

improper and/or unauthorized markdown/purchase issues such as Plaintiff's situation, Ms. Floyd

consistently determined termination to be the appropriate discipline.  (Doc. #13 Ex. 1 at ¶ 18).

Wal-Mart's progressive discipline/"Coaching for Improvement" Policy provides that progressive

levels of discipline do not apply when Associates have engaged in gross misconduct. Rather, those

Associates are subject to immediate termination.  (*Id*. at ¶ 8, Ex. 1).

     Ms. Floyd and Mr. Fagan came to the decision that Plaintiff had committed gross misconduct

and that her employment should be terminated.  (Doc. #16 Ex. 5 at 43; Doc. #13 Ex. 1 at ¶¶ 17, 19;

Doc. #16 Ex. 6 at 19).  Mr. Fagan communicated the termination decision to Mr. Becton, who

ultimately oversaw Plaintiff's discharge on October 31, 2005.  (Doc. #16 Ex. 6 at 19; Doc. #14 Ex

11).  Therefore, Plaintiff's employment was terminated for violating Wal-Mart's Associate

---

[3]Ms. Floyd was the Regional Personnel Manager for the region encompassing Store No. 423 between February 2005 and January 2006.  (Doc. #13 Ex. 1 at ¶ 3).  As the Regional Personnel Manager, Ms. Floyd was responsible for overseeing personnel matters for 90 Wal-Mart stores within her region.  (*Id*. at ¶4).  Ms. Floyd's job responsibilities included staffing management at various stores, decision-making with respect to some Associate terminations, and receiving open-door complaints from various Associates throughout her region.  (*Id*. at ¶ 5; Doc. #16 Ex. 6 at 10).  As examples, Ms. Floyd would be involved in an Associate's termination when the Associate to be disciplined was a long-time Associate at Wal-Mart, or when the termination involved gross misconduct.  (Doc. #13 Ex. 1 at ¶ 6; Doc. #16 Ex. 6 at 10).  Ms. Floyd would also participate in decisions regarding the termination of long-time Associates to ensure that termination was the right decision, and that there was no appropriate alternative discipline which would have allowed an Associate to continue working with Wal-Mart.  (Doc. #13 Ex. 1 at ¶ 7).

Purchases Policy when she marked down an item and purchased it prior to the twenty-four hour waiting period.  The item had not been available for customers to purchase at the reduced price. (Doc. #16 Ex. 6 at 23–25).

## IV.    DISCUSSION

Plaintiff has asserted two claims in this case: (1) retaliation in violation of Title VII; and (2) discriminatory discharge based on race in violation of Title VII and § 1981.  For the reasons outlined below, summary judgment is due to be granted in favor of Defendant on both claims.

### A.    Plaintiff's Retaliation Claim.

Plaintiff's retaliation claim fails for two alternative reasons, both of which warrant judgment in favor of Defendant: (1) she has failed to establish a prima facie case; and, in any event, (2) Wal-Mart has articulated, legitimate, non-discriminatory reasons for the decision to terminate Plaintiff that she has not shown are a pretext for retaliation.

### 1.    Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation Under Title VII.

Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); *see also Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 586 (11th Cir. 2000) ( "Retaliation is a separate violation of Title VII.").  When a claimant offers no direct evidence of discrimination (as is the case here),[4] but rather relies upon circumstantial evidence,

---

[4]Plaintiff states in her opposition brief that she is attempting to prove her claims via the "indirect method" as set forth in *McDonnell Douglas*.  (Doc. #17 at 15).  Plaintiff offers no direct evidence of discrimination.

Title VII retaliation claims turn on traditional *McDonnell Douglas* burden-shifting principles. *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002). Thus, a plaintiff bears the burden of establishing a *prima facie* case of retaliation by showing that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and, (3) there was a causal link between her protected activity and the adverse action. *Stavropoulos v. Firestone*, 361 F.3d 610, 616 (11th Cir. 2004); *see also Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 (11th Cir. 2003); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002); *Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1117 (11th Cir. 2001).

The court concludes that Plaintiff has offered sufficient evidence to establish the first requirement of her *prima facie* case. Plaintiff engaged in a statutorily protected activity when she made a statement to her supervisor that she felt that Mr. Becton was discriminating against her. (Doc. #16 Ex. 1 at 32–33). Although Plaintiff did not file a formal complaint, making an informal complaint to supervisors concerning suspected illegal discrimination may qualify as a protected expression under Title VII's Opposition Clause.[5] *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997); *see also Rollins v. Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). The

---

[5]Title VII recognizes two types of statutorily protected activity. Under the Opposition Clause, an employer may not retaliate against an employee because the employee has opposed any practice protected by Title VII. 42 U.S.C. § 2000e-3(a). Under the Participation Clause, an employer may not retaliate against an employee because the employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. *Anduze v. Florida Atl. Univ.*, 151 F. App'x 875, 877 (11th Cir. 2005). Here, it is undisputed that Plaintiff did not file an EEOC charge or otherwise participate in Title VII proceedings prior to filing this lawsuit; therefore, her claim arises under Title VII's Opposition Clause. The court notes that "Opposition Clause acts are viewed in the context of the ordinary business environment, and, thus are given less protection than Participation Clause acts." *Id.* at 878 (citing *EEOC v. Total Sys. Servs. Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000)).

11

court is satisfied that the informal complaint Plaintiff made to Mr. Fagan in June or July of 2005 constitutes a statutorily protected activity for the purposes of her retaliation claim.[6]

However, Plaintiff is unable to establish a *prima facie* case because she lacks evidence to satisfy the third element of a causal link between her report of discriminatory behavior and her subsequent termination. Plaintiff claims that the three-to-four month period between the two events is sufficient for a reasonable fact-finder to infer that her termination was motivated by racial discrimination. (Doc. #17 at 28). On this record, the court disagrees. "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000). While an employer's decision to take an adverse employment action against an employee *shortly* after an employee's protected expression, standing alone, may be enough to produce an inference of retaliation, Eleventh Circuit case law reflects that a three-to-four month interval is insufficient to reach such a conclusion. *See Balletti v. Sun-Sentinel Co.*, 909 F. Supp. 1539, 1549 (S.D. Fla. 1995) ("The shorter the period between the two events, the stronger the inference that the adverse action was improperly motivated."); *accord Brungart v. BellSouth Telecommc'ns, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Specifically, in *Higdon v. Jackson*, 393 F.3d 1211 (11th Cir. 2004), the Eleventh Circuit denied recovery in a Title VII retaliation claim, noting that the Supreme Court, in *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001), "cited with approval decisions in which a three-to-four month disparity was found to be insufficient to show causal connection." *Higdon*, 393 F.3d at 1221. In light of that Eleventh

---

[6]With respect to the second *prima facie* element, there is not a dispute concerning Plaintiff's ability to offer evidence that she suffered an adverse employment action, as her employment was terminated in October 2005.

Circuit case law, the court finds that Plaintiff cannot rely *solely* upon the timing of the two events to establish a causal link between her complaint of discrimination and subsequent termination.

But even assuming *arguendo* that a three-to-four month interval between Plaintiff's claim of discrimination and her termination would, under certain circumstances, establish an inference of retaliation, the court would nevertheless conclude that any "inference" of retaliatory intent otherwise created by a short lapse of time [is] dispelled when intervening factors are established." *Wu v. Se.-Atl. Beverage Corp.*, 321 F. Supp. 2d 1317, 1337 (N.D. Ga. 2004) (citing, *e.g.*, *Robinson v. AFA Service Corp.*, 870 F. Supp. 1077, 1084 (N.D. Ga. 1994) (finding absence of causal link, despite termination one day after employer learned of plaintiff's discrimination charge, where plaintiff had been warned numerous times regarding her job performance); *Booth v. Birmingham News Co.*, 704 F. Supp. 213, 215–16 (N.D. Ala. 1988) (holding that a short span of time created no reasonable inference of retaliation where the record contained "intervening factors," *i.e.*, other reasons for the adverse action arising after the protected activity), *aff'd without opinion*, 864 F.2d 793 (11th Cir. 1988)).

In the instant case, Plaintiff was terminated after she violated Defendant's Associate Purchases Policy.  While Plaintiff complained of prejudicial treatment in June or July 2005, she was not terminated until she undisputedly reduced the price of the MP3 player and purchased it without waiting the requisite twenty-four hour period.  (Doc. #16 Ex. 6 at 18–19).  The court finds that Defendant's good faith belief that Plaintiff's admitted actions violated the company's Policy is sufficient to establish an intervening event, which breaks any chain of causation that may exist between her complaint of discrimination and subsequent termination.  Accordingly, the court

concludes that Plaintiff has failed to establish the causal connection required for her to make out a *prima facie* case of retaliation.

Plaintiff also argues the required causal connection between her protected activity and the adverse employment action of termination is established by a pattern of allegedly retaliatory incidents that occurred following her discrimination complaint in June or July 2005. (Doc. #16 Ex. 1 at 37–40, 47–54). It does not appear that Plaintiff seeks to rely upon those incidents (or the combination thereof) as independent adverse actions in addition to the termination, but rather has proffered them as circumstantial evidence of a causal link between her complaints and termination.[7] *See* Doc. #17 at 28 n.5.

---

[7]Nonetheless, the court notes that the Eleventh Circuit has held that a series of retaliatory actions falling short of ultimate employment decisions may be considered adverse employment actions:

> We need not determine in this case the exact notch into which the bar should be placed. It is enough to conclude, as we do, that the actions about which Wideman complains considered collectively are sufficient to constitute prohibited discrimination. We need not and do not decide whether anything less than the totality of the alleged reprisals would be sufficient.

*Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998). These threats of retaliation against Wideman included threats of physical violence, so that when she stated that she intended to call Wal-Mart headquarters to discuss allegations of discrimination, her Assistant Manager threatened to shoot her in the head. *Id.* at 1455. In this case, even if Plaintiff alleged that the incidents collectively constituted an adverse action under *Wideman*, that argument would fail. The facts of *Wideman* are distinguishable from those in this case based upon the severity of alleged retaliatory actions used to support each claim. Plaintiff bases her pattern of retaliatory incidents on the following: (1) Mr. Becton's request that Plaintiff lead the Wal-Mart Cheer at an employee meeting; and (2) Plaintiff being denied the authority to order Wal-Mart shirts without prior permission. (Doc. #16 Ex. 1 at 49–58). While the threats made against the plaintiff in *Wideman* were clearly in violation of company policy (and most likely criminal law, for that matter), the decision to deny Plaintiff's request to order Wal-Mart shirts and the request that she lead the Wal-Mart Cheer were made in accordance with standard company Policy and procedure. (Doc. #16 Ex. 1 at 51, 57).

Here, the court concludes that Plaintiff has not presented sufficient evidence of a "pattern" of retaliation to establish an adverse employment action so as to alter the causation inquiry. That is, the relevant causal link cannot be established between Plaintiff's discrimination complaint and any of the incidents about which she complains. On this record, the court concludes that Plaintiff's allegations about incidents of repeated retaliation are insufficient to establish a *prima facie* claim for a pattern of retaliatory behavior.

### 2.     Plaintiff Cannot Show Wal-Mart's Reason for Her Termination is Pretextual.

Once a plaintiff establishes a *prima facie* case of retaliation (which Plaintiff has failed to do here), the defendant is required to articulate a legitimate, non-retaliatory reason for the employment decision. Even assuming that Plaintiff could establish a *prima facie* case of retaliation (and she cannot), Defendant has offered a legitimate reason for her termination—her violation of the Associate Purchases Policy. Plaintiff must then show that Defendant's reason for taking the adverse employment action is a pretext for retaliation. To meet this burden, Plaintiff "must present 'significantly probative' evidence on the issue to avoid summary judgment." *Young v. Gen. Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). "Conclusory allegations of [retaliation], without more, are not sufficient to raise an inference of pretext or intentional [retaliation] where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." *Young*, 840 F.2d at 830. Plaintiff claims that Defendant's proffered reason is a pretext for retaliation because: (1) she did not violate employee Policy; and (2) the pattern of conduct Defendant displayed after she made her initial

complaint was retaliatory in nature and indicative of discriminatory intent.  (Doc. #17 at 20–22, 29–30).  Again, the court disagrees.

Plaintiff has failed to carry her Rule 56 burden in this case.  In her opposition, Plaintiff makes several attempts to parse the language of the Associate Purchases Policy and the facts of this case to say that the Policy did not apply to the markdown and purchase of the MP3 player.  The court will address each of these attempts in turn.  Suffice it to say, however, that while Plaintiff has explained why this court should disagree with Wal-Mart's reason for discharging her, she has done nothing to say why a jury may disbelieve that reason.

First, Plaintiff argues that the Policy provision requiring that Associates purchase merchandise that has been available to customers should be interpreted to mean that items in the stockroom could not be marked down and purchased, and because the MP3 player was located in the display case and in plain view of customers (*i.e.*, not in the stockroom) it follows that it was available to the public.  This argument deserves an "A" for creativity, but it fails the consistency test—consistency with the undisputed evidence that is.  Here, Plaintiff marked the MP3 player down and then purchased it for herself immediately after doing so.  The item was never available to the public *at the price at which Plaintiff reduced and purchased it*.  The plain language of the Policy clearly requires availability to the public *at the reduced price*.  (Doc. #14 Ex. 6) ("offered to the public at the lower price for at least 24-hours).

Second, Plaintiff argues that because the MP3 player was not defective or damaged, the Markdowns provision of the Policy does not apply.  This argument conveniently overlooks the following langage of the Policy:  "Only Salaried Members of Management can authorize the point-of-sale markdown of an item (*i.e.*, no other store Associate may put a clearance price on defective

16

or damaged merchandise).  Neither the Facility Manager nor any Salaried Member of Management

may authorize such markdowns on items they intend to purchase.  It is a violation of this Policy for

anyone to authorize a markdown on items they intend to purchase."[8]

In any event, Plaintiff has attempted to characterize the Policy in her favor, but failed to

address one portion of the Policy that clearly applies to her actions:  "[a]n Associate may not

knowingly purchase mis-priced merchandise."  Here, even assuming that Ms. Naish authorized

Plaintiff to mark down the MP3 player,  it is undisputed that Plaintiff marked the item at a lower

price that Ms. Naish directed.  Therefore, it was reasonable for Wal-Mart to conclude that Plaintiff

knowingly purchased an item that she herself had  mis-priced.

Finally, even assuming Plaintiff's misconduct (and the undisputed evidence establishes that

is exactly what it was) does not fit squarely within the letter of the work rule at issue, Plaintiff has

presented no evidence calling into question Wal-Mart's good faith belief that Plaintiff's conduct

violated the Policy and its spirit.  *See Holmes v. West Palm Beach Hous. Auth.*, 309 F.3d 752, 755

(11th Cir. 2002) ("An employer articulates a legitimate nondiscriminatory reason for termination

where the employer had an honest, good faith belief in the reason for termination, even if it turns out

that the employer was mistaken in that belief."); *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171,

1176 (11th Cir. 2000) ("'Pretext is not demonstrated by showing simply that the employer was

mistaken.'") (quoting *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995)); *Silvera v.

Orange County Sch. Bd.*, 244 F.3d 1253, 1261 (11th Cir. 2001), *cert. denied*, 534 U.S. 976 (2001)

(pretext means more than a mistake by the employer; actions taken based on a mistaken, non-

---

[8]Although Plaintiff asserts in the most conclusory manner that others have done the same,
she has provided no substantial evidence to support that assertion.

discriminatory belief do not violate Title VII); *Lee v. GTE Fla., Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000), *cert. denied*, 532 U.S. 958 (2001) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken, but that they were in fact motivated by sex."); *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1339 (11th Cir. 2000), *reh'g denied*, 218 F.3d 749 (11th Cir. 2000) ("[A] plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race."); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (court's pretext inquiry is properly limited to whether the decision-makers believed the employee had engaged in conduct for which he was terminated and if so whether this belief was the reason for the discharge, not whether plaintiff was actually guilty of the conduct); *Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1501 (11th Cir. 1985) (employer's belief, honest but mistaken, may nonetheless provide legitimate reason for discharge).   Despite Plaintiff's conclusory assertion to the contrary, she has offered no evidence that contradicts the evidence before this court that Defendant terminated Plaintiff's employment because it believed that she had violated its policies by reducing the price of the MP3 player and then purchasing it before the twenty-four hour waiting period expired.  That misconduct—substantially reducing the price of merchandise and then immediately purchasing it for herself—is exactly the type of misbehavior the Policy seeks to prohibit.

 In addition, Plaintiff has not put forth evidence sufficient to show that her termination was motivated by retaliatory intent.  It is well-established that the federal courts should not serve as "super-personnel department[s] that reexamine[ ] an entity's business decisions."  *Chapman v. AI Transport*, 229 F.3d 1012, 1024–25 (11th Cir. 2000) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)); *Alpin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir.

1991) (holding that courts do not sit "as a super-personnel department[s] that re-examine an entity's business decisions."). Thus, even if Plaintiff could show the underlying reason for the decision to terminate her employment was based on erroneous facts, absent a showing of retaliatory intent, the employment decision does not violate Title VII.

### B.    Plaintiff's Claim of Discriminatory Discharge.

Next, Plaintiff asserts that Defendant violated Title VII[9] and § 1981[10] by terminating her employment on the basis of race.  (Doc. #17).  The court relies on cases interpreting the Title VII standard for both of Plaintiff's claims because the standards for evaluating § 1981 and Title VII claims are the same.  *See Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (holding that Title VII and § 1981 have the same requirements of proof and use the same analytical framework).  A plaintiff raising a Title VII claim of discriminatory discharge must prove that the defendant acted with an intentional discriminatory purpose.  *Nix v. WLCY Radio/Rahall Commc'ns.*, 738 F.2d 1181, 1184 (11th Cir. 1984). The plaintiff has the burden to establish a *prima facie* case of employment discrimination by a preponderance of the evidence.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  This *prima facie* case can be established by showing:  (1) that she belongs to a protected class; (2) that she suffered an adverse employment action; (3) that she was qualified for her position; and, (4) that a similarly situated person outside of the plaintiff's protected

---

[9] Title VII claims of racial discrimination are premised upon 42 U.S.C. § 2000e-2(a), which provides, in pertinent part, that "it shall be unlawful employment practice . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a) (2005).

[10]42 U.S.C. § 1981 states in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts." 42 U.S.C. § 1981(a).

class received more favorable treatment, or that the plaintiff was replaced with someone outside of the plaintiff's protected class. *Bolton v. Potter*, 198 F. App'x 914, 916 (11th Cir. 2006); *Nix*, 738 F.2d at 1183.

Here, unlike with her retaliation claim, the court finds that Plaintiff can establish a *prima facie* case of race discrimination. As an African-American, Plaintiff belongs to a protected class. Plaintiff suffered an adverse employment action when she was terminated from her position as a Health and Beauty Department Manager on October 31, 2005. (Doc. #16 Ex. 6 at 18). Defendant does not dispute that Plaintiff was qualified for her position. Plaintiff received six performance evaluations and scored highly on each. (Doc. #14 Ex. 8). Lastly, Plaintiff was replaced with someone outside of her protected class, given that her position was filled by Judy White, a Caucasian female. (*Id.*).

Having established a *prima facie* case, the burden of producing legitimate, nondiscriminatory reasons for the challenged employment action shifts to the employer. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–803 (1973). To satisfy that burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. . . . It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. 248, 254–55 (1981) (internal citation and footnote omitted). "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had *not* been motivated by discriminatory animus." *Id.* at 257 (emphasis added). Here, Defendant has satisfied its burden

by claiming that Plaintiff was terminated for violating Wal-Mart's Associate Purchases Policy by discounting the price of an MP3 player from $53.00 to $10.00.[11]

Once a defendant satisfies its intermediate burden of production, and the initial presumption of discrimination accompanying the *prima facie* case has been eliminated, the plaintiff must create a genuine issue of material fact as to whether the reasons advanced by the defendant are pretextual. *Bogle v. Orange County Bd. of County Comm'rs*, 162 F.3d 653, 658 (11th Cir. 1998). This requires a plaintiff to provide sufficient evidence to allow a reasonable fact finder to conclude that the proffered reasons were not actually the motivation for her discharge. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045 (1998). The plaintiff may do this (1) by showing that the legitimate nondiscriminatory reasons should not be believed, or (2) showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons. *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996).

In this case, Plaintiff argues that the evidence indicates that the legitimate nondiscriminatory reasons are not believable, and that race more likely motivated Defendant's decision to terminate her. (Doc. #17 at 19–26). Plaintiff first attempts to discredit Defendant's claim that she violated Defendant's Associate Purchases Policy. (*Id*. at 20–24). While Defendant allegedly fired Plaintiff for failing to wait twenty-four hours to purchase merchandise placed on clearance, Plaintiff states that this Policy applies only to "defective or damaged" merchandise and the MP3 player in question was not "defective or damaged." (*Id*. at 21–22). The court has already indirectly addressed this

---

[11]"Associates must select merchandise for purchase, which is available to all Customers/ Members." (*See* Doc. #14 Ex. 6).

argument on page 15–16 *supra*.  However, even if the court were to find that Defendant was

incorrect concerning its belief that Plaintiff violated the Policy:

> [E]vidence showing a false factual predicate underlying the employer's proffered reason does not unequivocally prove that the employer did not rely on the reason in making the employment decision.  Instead, it may merely indicate that the employer, acting in good faith, made the disputed employment decision on the basis of erroneous information . . . .  [E]stablishing pretext is not merely demonstrating that the employer made a mistake [in its assessment of an employee's job performance or conduct], but that the employer did not give an honest account of its behavior.

*Walker v. Nations Bank of Fla. N.A.*, 53 F. 3d 1548, 1564 (11th Cir. 1995) (internal citations and

footnote omitted).[12]  Plaintiff cannot make such a showing here.  There is simply no evidence

whatsoever indicating that Defendant lacked a good-faith belief that Plaintiff violated employee

Policy.  *See* pp. 15–18 *supra*.  Accordingly, the court finds this argument to be without merit.

Plaintiff next attempts to establish pretext by discrediting Defendant's articulated reason for

her termination.  (Doc. #15 Ex. 1).  Specifically, Plaintiff argues that Defendant treated similarly

situated employees in a preferable manner.  (*Id.*).  Eleventh Circuit jurisprudence is clear that a

plaintiff may establish pretext by proving that a similarly-situated individual outside the plaintiff's

protected class was treated more favorably.  *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273,

283 n.11 (1976).  Plaintiff bases this claim on her allegation that several white employees engaged

in similar conduct and their employment was not terminated as a result.  (Doc. #16 Ex. 1).  Of

course, Plaintiff has the burden of showing that she and the alleged comparator employees are

similarly situated in all relevant respects.  *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

"In determining whether employees are similarly situated for purposes of establishing a prima facie

case, it is necessary to consider whether the employees are involved in or accused of the same or

---

[12]The cases cited on pages 11 and 12, *supra*, apply with equal force here.

similar conduct and are disciplined in different ways." *Id.*; *Knight v. Baptist Hosp.*, 330 F.3d 1313, 1316 (11th Cir. 2003); *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001).

These principles have particular application in cases involving an employee who was discharged for the alleged violation of a work rule. A plaintiff fired for misconduct must show that the employer retained an employee outside the protected class whom the employer believed engaged in "nearly identical" misconduct. *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185–1187 (11th Cir.1984). *See also, Jones v. Gerwens*, 874 F.2d 1534, 1540–42 (11th Cir. 1989), *modified by Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 n.6 (11th Cir.1998) (holding that, in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff must show that the disciplinary measures enforced against him were more severe than those enforced against the other persons outside his protected class who were believed to have engaged in similar misconduct). "The Eleventh Circuit requires that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges." *Vickers v. Fed. Express Corp.*, 132 F. Supp. 2d 1371, 1380 (S.D. Fla. 2000) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368–69 (11th Cir. 1999)); *see also Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (requiring the comparator's situation to be "nearly identical"). In addition, "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules, . . ." *Maniccia*, 171 F.3d at 1369 (citing *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d at 1311 (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir.1984))).

Here, setting aside the question of whether the alleged comparators' misconduct was "nearly identical" to Plaintiff's, Plaintiff fails to prove that Defendant knew of these violations, and nevertheless chose to disregard the White employees' conduct. Because Plaintiff cannot prove that

Defendant knew of the alleged infractions committed by those outside Plaintiff's class, the court concludes Plaintiff fails to establish such white employees are similarly situated to her (and therefore are her "comparators" for the purpose of establishing pretext).  Accordingly, the court finds Plaintiff cannot show that Defendant's proffered reason for her discharge is pretextual, and her claim of discriminatory discharge fails.

**V.      CONCLUSION**

As set forth above, the court concludes that Defendant's Motion for Summary Judgment (Doc. #13) is due to be granted, as there is no issue of material fact.  The court will enter an order consistent with this memorandum opinion dismissing all of Plaintiff's claims against Wal-Mart.

**DONE** and **ORDERED** this _____20th_____ day of August, 2007.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE